Filed 9/3/14  In re Phillip B. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re PHILLIP B., a Person Coming Under the Juvenile Court Law. | B251991 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent.<br><br>    v.<br><br>LORI M.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK96496) |


APPEAL from a judgment of the Superior Court of Los Angeles County. Annabelle Cortez, Judge.  Affirmed.


Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.


John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and John Savittieri, Deputy County Counsel for Plaintiff and Respondent.

Lori M. (mother), mother of Phillip B. (born November 2002), appeals from a final judgment terminating jurisdiction of the juvenile court over Phillip pursuant to Welfare & Institutions Code section 361.2.[1]  Mother challenges the adequacy of the juvenile court's final custody and visitation order entered in the case.  We find no error and affirm the judgment.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Family information**

The family consists of mother, Joshua B. (father), and Phillip.[2]  At the relevant times Phillip was living with father pursuant to a family law order granting father full physical custody.  Mother had alternating weekend visits with Phillip.  Mother's male companion was Christopher M. (Christopher).

Phillip's half-sibling, K. M. (born January 2007) lived in Iowa with her father, Michael M. (Michael), by agreement between mother and Michael.

**Referrals and investigation**

The investigation of the family by the Los Angeles County Department of Children and Family Services (DCFS) began on July 10, 2012, when DCFS received a referral alleging that that an incident of domestic violence had taken place between mother and Christopher while Phillip was visiting mother.  When interviewed, then nine-year-old Phillip reported that mother and Christopher had an argument and he was frightened.  Christopher started kicking things and screaming.  Phillip's half-sister was also visiting mother's home at the time.  Phillip reported that he and his sister went outside and a neighbor kept them safe.  Phillip reported that he was afraid to go back to his mother's house.

In October 2012, DCFS received another referral alleging that Phillip was a victim of severe neglect and emotional abuse by father.  The reporting party stated that there was

---

[1]     All further statutory references are to the Welfare & Institutions Code unless otherwise indicated.

[2]     Father is not a party to this appeal.

an ongoing custody dispute, and that father was alienating Phillip from mother and "brainwashing" him. The reporting party also stated that father was ignoring Phillip's dental and medical needs, was an alcoholic and drove with Phillip in the car while drunk, and had a history of psychiatric problems. In addition, the reporting party stated that Phillip told mother at their last visit in August 2012 that he no longer wanted to live.

When a social worker met with father in July 2012, father reported that Phillip had been seeing a therapist for about three months due to his issues with his mother and some bullying that was going on at school. Father said that Phillip had been living with him for almost four years and it was going well. Father's parents helped out and Phillip enjoyed being with them. Father admitted to a history of substance abuse but stated that he had been sober for eight years. Father's last arrest was in 2008 for DUI. He reported a psychiatric hospitalization in 2002, but denied current mental health problems. Father stated that he occasionally smoked marijuana for back pain and was in the process of obtaining a medical marijuana card.

On July 25, 2012, father tested positive for marijuana. Father's fiancé, Mary, tested positive for opiates and hydrocodone.

Father said that he stopped allowing Phillip to visit mother after the July 2012 incident. Phillip had been frightened and was often afraid to go to mother's home. Phillip's last visit with mother was in August 2012. Father did not want to force Phillip to visit with mother. Father provided the social worker with a copy of the Los Angeles County Superior Court family law order.

Mother was also interviewed in July 2012. She stated that she and Christopher had a fight because he arrived home late from work on a night when they planned to have a family night with the children. Mother said her neighbors overreacted and called the police. She said the neighbors called the police all the time to harass them because they wanted her and Christopher's property. Mother stated that when police arrived, an officer informed her that Phillip had reported that mother or Christopher threatened to use a gun during the fight. Mother admitted that there was a loaded gun in the house, but

3

stated that it was in a locked safe and denied that either she or Christopher threatened to use it during the fight.

Mother reported using marijuana for anxiety and medical reasons, including during her pregnancies because she did not believe that it would affect the babies. Mother had a medical marijuana card and presented it to the social worker. Mother declined DCFS's request that she submit to a drug test, stating that she did not have transportation to the drug testing location.

Mother denied a history of mental illness. The social workers noted that mother became irate, emotional and tearful when discussing the referrals, her lack of contact with her children, and her personal history. DCFS requested that mother participate in an upfront assessment, which would include a mental health screening. Mother declined. Mother abruptly ended her first interview with DCFS and asked the social worker not to return.

Mother reported that she and father had a history of domestic violence, but that she had only had verbal disputes with K.'s father, Michael, and Christopher. Mother said she and father did not get along. She claimed that father was a drug and alcohol abuser, and it was her belief that father used these substances in Phillip's presence. She stated that father drove under the influence of alcohol with Phillip in the car. She also said father was bipolar and had at least one prior psychiatric hospitalization in 2002. Mother believed father was not taking Phillip to the dentist or doctor or providing for his basic needs.

Mother had a video camera mounted to her front door and a sign reading "[S]mile, you are being video taped." Mother explained she was taking precautions to protect her property because she was having problems with the neighbors and things were being stolen.

Phillip was also interviewed. He related that at the time of the July 2012 incident he was visiting with mother. K. was also visiting from Iowa. Mother was angry because Christopher arrived home late from work. Phillip said they were screaming and arguing but did not hit each other, and that they calmed down after five or ten minutes. Phillip

4

and K. were nervous and scared. During the fight, a neighbor came and took him and K. to the neighbor's house, at which time he disclosed that mother kept a gun in a safe.

Phillip said that mother usually starts the fights with Christopher. Phillip reported that he once saw mother pin Christopher to the floor.

Phillip said he had not visited mother since the July 2012 incident. He was not sure he wanted to because he was afraid that she would be angry because he reported the incident to his therapist. Phillip informed the social worker that mother hit him in the past. He was afraid because mother had a gun. Phillip said Christopher treated him well.

Phillip said father did not hit him and Mary treated him well. He stated that he never saw father intoxicated or using drugs. Phillip denied that father drove drunk when he was in the car. Philip admitted that he did not want to live when he was in second grade. But things were currently better and he no longer wanted to die. He reported problems at school and had been suspended and expelled.

Father's companion, Mary, was also interviewed. She stated that she was concerned for Phillip's safety while in mother's care. Phillip had insomnia on some nights and did not want to visit with mother. Mary denied that she abused substances. She stated that she took medication and showed the social worker the prescription bottles. Mary informed the social worker that she was arrested for driving under the influence in 2006, for which she was convicted and served a jail sentence. She denied that she or father currently drive after drinking.

Christopher, mother's companion, reported that he had a good relationship with Phillip and missed him. Christopher stated that he and mother had verbal disputes and admitted that during the last one they went a little overboard. Christopher denied a history of substance abuse or mental illness.

Michael, father of K., was interviewed by Iowa child protective services social workers. He reported that K. had been in his care for more than three years. K. had not been to visit mother since the incident in July 2012.

**Section 300 petition and detention**

On November 9, 2012, DCFS secured a warrant for removal of Phillip from mother only.

On November 16, 2012, DCFS filed a section 300 petition on behalf of Phillip. Under section 300, subdivision (a) (serious physical harm), counts 1 and 2, DCFS alleged that mother physically abused Phillip and that mother and Christopher engaged in violent altercations in the child's presence. Under section 300, subdivision (b) (failure to protect), counts 1 through 4, DCFS alleged that mother had a history of illicit drug use and is a current abuser of marijuana, that father had a history of illicit drug use and is a current abuser of marijuana, that mother previously physically abused Phillip, and that mother and Christopher engaged in a violent altercation in the child's presence.

The detention hearing occurred on the same day. Mother and father were present and were appointed counsel. The court found a prima facie case to detain Phillip from mother's custody. The child was released to father. The court ordered monitored visits for mother. The matter was set for adjudication on December 12, 2012.

**Subsequent interviews**

On December 6, 2012, the DCFS social worker telephoned mother to schedule an interview. Mother immediately became defensive. Mother refused to meet with social workers from DCFS's Glendora office and requested that her case be transferred to another DCFS office. Mother told the social worker that she had contacted the Department of Justice and the Board of Supervisors to file a complaint and lawsuit because her civil rights had been violated. She stated that unless her case was "thrown out, someone files an appeal or retracts all the statements that have been falsified" against her, she would proceed with the lawsuit.

The same day, the social worker interviewed father and Phillip, who repeated in substance what they had previously said in interviews. Phillip provided additional detail about the July 2012 incident. He stated that during the argument, Christopher began kicking things. One object bounced close to mother, making her more upset. A neighbor heard the argument and came over to get him and K. out of the house. Phillip mentioned

6

the gun because he was afraid that mother or Christopher might use it. The neighbor then telephoned the police.

Phillip stated that he had not visited mother since the July 2012 incident. When the social worker explained the meaning of monitored visits, Phillip indicated that he was more inclined to visit if there was someone there to protect him.

DCFS recommended that the juvenile court sustain the counts alleging the July 2012 incident, as well as the counts alleging mother's and father's substance abuse. DCFS recommended that the juvenile court dismiss the counts alleging physical abuse by mother. DCFS recommended that mother participate in a mental health assessment, parenting and domestic violence programs, random drug testing, and enroll in a substance abuse treatment program if she missed a test or tested positive for drugs.

**Intervening events**

In February 2013, DCFS reported that mother sent a text message to the personal cell phone of one of the social workers and stated that she had the social worker's home address. Mother reportedly claimed that her private investigator discovered information about the social worker that would possibly cause her to be fired. Mother claimed that the DCFS Glendora office would be cleaned out because she was in the process of having a lot of people fired based on the information she obtained. DCFS requested a court order preventing mother from contacting the social worker on her cell phone or at her home address, but allowing mother to communicate with the social worker using her work telephone or office address.

In February 2013, mother reported to DCFS that she was not receiving visits with Phillip, commenting "[T]his is total parent alienation." Father reported that Phillip was afraid to visit mother.

In March 2013, DCFS reported to the juvenile court that mother expected to have surgery on her back, and was suffering from medical problems, causing her to cancel visits with Phillip. DCFS reported that Phillip was doing well with father and recommended that the juvenile court terminate jurisdiction with a family law order

7

granting joint legal custody to the parents, physical custody to the father, and monitored visits for mother.

**First amended section 300 petition and supplemental report**

On July 24, 2013, DCFS filed a first amended section 300 petition. In addition to the counts alleged in the November 16, 2012 petition, DCFS alleged that mother fabricated stories and that Phillip was afraid to have contact with mother without a monitor. The petition further alleged that mother's emotional and mental instability caused Phillip to experience anxiety and distress.

On July 26, 2013, DCFS reported to the juvenile court that Phillip began visiting mother in February 2013. Some visits went well and others did not. Phillip was angry after some visits with mother and described her as "lightning in a bottle." In July 2013, Phillip requested that visits with his mother be stopped for three weeks. DCFS recommended to the juvenile court that mother's visits should be in a therapeutic setting once Phillip was ready to resume the visits.

DCFS reported that mother appeared on television news on June 21, 2013, in a segment reporting a protest at DCFS headquarters. Mother reportedly showed a picture of Phillip on the news, and claimed he arrived at one of her monitored visits with a black eye. Mother said she confronted father about Phillip's black eye and that DCFS consequently told her that she could not see Phillip any longer. DCFS requested that the juvenile court order mother not to discuss the case with the news media to protect Phillip's privacy.

On August 30, 2013, DCFS recommended that the juvenile court sustain the first amended petition, and issue a family law order granting joint legal custody to the parents, sole physical custody to father, and monitored visits for mother in a therapeutic setting.

**Jurisdiction/disposition hearing**

The jurisdictional hearing was continued in December 2012, March 2013, July 2013, August 2013, and September 2013 for various reasons including discovery, mother's poor health and anticipated surgery, and the appointment of a new attorney for mother.

8

On October 1, 2013, the juvenile court convened for a combined jurisdiction and disposition hearing. Mother and father appeared before the court. Father testified that Phillip was anxious after his visits with mother. Father stated that Phillip told him in recent months that he did not want to visit with mother. Father testified that Phillip had some visits with mother that went well. On other occasions, Phillip was angry after the visits.

Christopher also testified. He stated that the July 2012 incident was a small dispute. He denied that there was any cursing, and denied that there were any guns involved. He also denied that mother had ever pinned him to the floor or injured him at any time.

The juvenile court sustained count b-4, concerning the altercation between mother and Christopher in July 2012, and count c-1, alleging that mother has shown emotional and mental instability and that Phillip was afraid to visit with her. The court dismissed the remaining counts in the interests of justice.

The court then proceeded to disposition. The court declared Phillip a dependent and removed Phillip from mother's custody. The court ordered joint legal custody to the parents, sole physical custody to father, and monitored visits for mother "in a therapeutic setting by a professional monitor or as mutually agreed upon by the mother and the father." When making its findings, the court stated, "[T]he evidence before the court shows that Phillip is well cared for and is safe in the father's custody." The court terminated jurisdiction pursuant to section 361.2, but stayed the order for father's counsel to prepare the family law order.

**Family law order and appeal**

On October 3, 2013, the juvenile court reconvened to receive the proposed family law order. Mother and father did not appear before the court. The court's minute order from the hearing reads: "Matter is heard by way of submitted case form." A form with the heading "Submitted Case Form" was filed with the court and contained the signatures of the attorneys for DCFS, Phillip, mother, and father. The form states, "The foregoing contains all of the issues agreed upon by the parties. It is respectfully requested that no

9

additions or modifications be made by the Court, absent the matter being called with an opportunity for the parties to be heard."

The juvenile court signed the family law order, which permitted mother visitation rights as set forth on form JV-205. The attached form JV-205 allows mother supervised visitation with "[a] professional monitor or any monitor agreed on by parents." The court lifted the stay of the order terminating dependency jurisdiction.

On October 8, 2013, mother filed her notice of appeal from the court's orders of October 1, 2013.

## DISCUSSION

### I. Mother's contention on appeal

Mother's sole contention on appeal is that the family law order is couched in language so vague and ambiguous that it furnishes her with no adequate standards for identifying a change of circumstances. Mother argues that the uncertainty created by the absent guidance denies her due process and renders the visitation order fatally flawed. Mother seeks remand with directions to the juvenile court to correct the family law order to identify the conduct or behavior she needs to change in order to secure liberalized visits with Phillip.

### II. Forfeiture

We first address DCFS's contention that mother forfeited this claim by failing to object in the juvenile court. DCFS argues that mother and her counsel were present at the disposition hearing, where the court ordered "monitored visitation for the mother in a therapeutic setting by a professional monitor or as mutually agreed upon by the mother and the father." Mother's counsel requested that mother not be required to pay for the monitored visits, but stated no other objection.

At the conclusion of the hearing, the court terminated jurisdiction, stayed the order of termination, ordered father's counsel to prepare the family law order, and continued the matter for receipt of the family law order.

On October 3, 2013, the juvenile court received from the parties the submitted case form and the proposed family law order to which mother now objects. Mother's

10

counsel signed the submitted case form and by doing so, informed the court that "the issues [were] agreed upon by the parties."

Therefore, DCFS argues, not only did mother fail to object to the visitation order at the disposition hearing, she consented to the order when her counsel submitted the case form to the juvenile court. As such, DCFS argues, mother' current objections are waived.

Application of the forfeiture rule in a dependency proceeding, where the terms of a visitation order are challenged, was discussed by the Supreme Court in *In re S.B.* (2004) 32 Cal.4th 1287 (*S.B.*), superseded by statute on another ground, see *In re M.R.* (2005) 132 Cal.App.4th 269, 273-274. The high court stated, "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. . . . The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" (*S.B., supra*, 32 Cal.4th at p. 1293, fn. omitted.) The court confirmed that "[d]ependency matters are not exempt from this rule. [Citations.]" (*Ibid*.)

The Supreme Court noted that "application of the forfeiture rule is not automatic. [Citations.]" (*S.B., supra*, 32 Cal.4th at p. 1293.) However, the high court made it clear that an appellate court's discretion to consider forfeited claims "should be exercised rarely and only in cases presenting an important legal issue. [Citations.]" (*Ibid.*) This is especially true in dependency cases, where "considerations such as permanency and stability are of paramount importance. [Citation.]" (*Ibid.*)

In *S.B.*, the Supreme Court held that the Court of Appeal did not err in exercising its authority to entertain mother's challenge to a visitation order notwithstanding mother's failure to object in the trial court. "The appeal presented an important issue of law: whether a juvenile court in a dependency case may delegate to the child's legal guardian the authority to decide whether a parent may visit the child, a question that has divided the Courts of Appeal." (*S.B., supra*, 32 Cal.4th at pp. 1293-1294.)

DCFS argues that no similar important issue of law is at issue in this appeal. Father was not granted the authority to decide whether mother could visit.

11

Mother concedes that the issue was not preserved for appeal. However, in contrast to DCFS, mother argues that she does present an important issue which will serve as a guide in the future: the extent of the precision required to be set forth in a custody and visitation order.

Mother cites only one case in support of her position: *In re S.J.* (2008) 167 Cal.App.4th 953 (*S.J.*). In *S.J.*, the Court of Appeal concluded that the juvenile court did not abuse its discretion in declining to modify the visitation order at issue in that case. In discussing the applicability of a certain statute, the court noted that the mother had not raised the issue in any of her petitions to the trial court -- instead, the Riverside County Department of Social Services (department) raised the issue for the first time in its brief. Mother then filed a supplemental response. (*Id.* at pp. 962-963.) The court concluded that the statute did not apply. (*Id.* at pp. 963-964.) Nothing in the *S.J.* opinion suggests that the issue before us in this case is of such importance that it must be decided in spite of mother's forfeiture.

Mother's alleged uncertainty regarding the precise conduct or behavior that she must change in order to secure a modification to the visitation order is not the type of important legal issue such as the one that was raised in *S.B.* Mother does not question the interpretation of a statute, or the applicability of a statute to the matter before us. Instead, her complaint involves her own uncertainty regarding the circumstances needed to justify liberalization of visitation. There is no suggestion that this issue has "divided the Courts of Appeal," as did the issue of statutory interpretation set forth in *S.B.* (*S.B., supra*, 32 Cal.4th at p. 1294.) Therefore, because the Supreme Court has cautioned that we should exercise our discretion to consider forfeited issues "rarely and only in cases presenting an important legal issue" (*id.* at p. 1293), we hold that mother's claim is forfeited and decline to exercise our discretion to consider it.

## III. The juvenile court's visitation order is not unconstitutionally vague

Mother forfeited her argument that the family law order is unconstitutionally vague. However, we note that even if mother had not forfeited this argument, we would

12

conclude that the order is sufficient. A trial court visitation order is reviewed under the abuse of discretion standard. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48.)

The juvenile court's order is not vague. It provides that mother will have supervised visitation according to a schedule determined by the parents. Mother's visits will be monitored by a professional monitor or any monitor agreed on by the parents. Mother presents no authority suggesting that the conduct or behavior that she should change must be set forth in the visitation order.

Mother has had ample notice of the conduct in need of correction. The allegations against mother were articulated in the sustained first amended section 300 petition, and discussed at the jurisdiction and disposition hearing. Further, as DCFS points out, section 827.10 authorizes DCFS to provide juvenile case files and records to participants in a related family law matter, including the judge in the family law case, the parent or guardian, or any attorney for a party to the family law case. (§ 827.10, subds. (a)(1), (a)(2), (a)(3).) Thus, mother not only has had ample notice of the conduct in need of correction, she also has access to the investigative records leading up to the juvenile court's order.

In support of her argument, mother cites *In re Mariah T.* (2008) 159 Cal.App.4th 428, 434 (*Mariah T.*), for the proposition that an order is unconstitutionally vague when "men of common intelligence must necessarily guess at its meaning and differ as to its application." The *Mariah T.* court was addressing the constitutionality of Section 300, subdivision (a). In concluding that the statute was not unconstitutionally vague, the court noted that "the dependency statutes may not forbid or require conduct in terms so vague "'"'that men of *common intelligence* must necessarily guess at its meaning and differ as to its application . . . .'"'" [Citation.]" The court did not address the standard for an unconstitutionally vague visitation order, and did not suggest that a family law order must specifically address the behaviors at issue when granting a parent monitored visitation.

Mother also cites *Martino v. Concord Community Hospital Dist.* (1965) 233 Cal.App.2d 51, 60 (*Martino*). The *Martino* court addressed a hospital's requirements for appointment to its medical staff. One of the requirements for hospital staff membership

13

was that the applicant take an examination "of 'those phases of medicine and surgery which we require our Staff members to be qualified in.'" (*Id.* at p. 54.) The appellant claimed that the examination requirement was invalid because it was in excess of the hospital's authority and was "vague, ambiguous and uncertain." (*Id.* at p. 57.) The Court of Appeal concluded that the hospital improperly required applicants to "take tests covering far more than his competence in his own particular field of medicine," and that "the examination requirement is couched in such vague and ambiguous language as to furnish the committee with no adequate standards for applying said requirement." (*Id.* at p. 60.) Again, the court did not address the standard for an unconstitutionally vague visitation order, and did not suggest that such an order must specifically address the parental behaviors requiring monitored visitation.

Mother has failed to show reversible error.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
FERNS


_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14